Judge McMahon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

SEMPRA ENERGY TRADING LLC,

            Plaintiff,

  - against -

TRAFIGURA AG,

            Defendant.

-------------------------------------------------------------- X

09 CIV. 5060
Index No.

**COMPLAINT**

RECEIVED
MAY 29 2009
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Sempra Energy Trading LLC. ("Sempra"), by its attorneys, Golenbock Eiseman Assor Bell & Peskoe LLP, on knowledge as to its own actions, and otherwise upon information and belief, alleges as follows:

## THE PARTIES

1. Plaintiff Sempra Energy Trading LLC ("Sempra") is a Delaware limited liability corporation with its principal place of business at 58 Commerce Road, Stamford, Connecticut 06902. Sempra markets and trades physical and financial energy products, including crude oil and refined products, natural gas and natural gas liquids, power, coal, emissions and ethanol.

2. Upon information and belief, defendant Trafigura AG ("Trafigura") is a privately held Swiss company with its headquarters in Lucerne, Switzerland. Trafigura does business in many countries throughout the world, including the United States. Trafigura does business in the United States through an office located at 1401 McKinney Street, Suite 2375, Houston, Texas 77010. At all relevant times, Trafigura was in the business of, among other things, trading crude oil and petroleum products.

## JURISDICTION AND VENUE

3.      This Court has subject matter diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a), because plaintiff and defendants are citizens of different states and the amount in controversy herein exceeds $75,000.00, exclusive of interest and costs.

4.      Venue is proper in this District, pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events giving rise to the claims occurred in this District. In addition, plaintiff and defendant expressly agreed with respect to the trades in question that each party submits to the exclusive jurisdiction of the courts of the State of New York and the federal courts situated in New York City, Borough of Manhattan.

## The Exchange Transactions

5.      The dispute in this case involves two agreements (exchange transactions) between plaintiff and defendant, both entered into in August 2008. Both agreements involved the purchase by Sempra from Trafigura of what is known as Domestic Sweet crude, and an associated sale by Sempra to Trafigura of what is known as Mars Blend crude. The parties' agreements were made through an exchange of documentation, the relevant terms and conditions of which are set out below.

6.      The first of the two exchange transactions (the "August 1, 2008 Exchange Agreement") was entered into between the parties on or about August 1, 2008. There were two parts to the agreement. Part 1 involved the purchase by Sempra from Trafigura of 1,000 barrels per day (approximately 30,000 barrels per month) of Domestic Sweet crude oil. The price of the crude oil was set at $126.50 per barrel, and the crude was to be delivered during the period from September 1, 2008 through and including September 30, 2008. The parties agreed that the crude

oil would be delivered via transfer into Teppco Pipe Line Company's facilities located at Cushing, Oklahoma.

      7.     Part 2 of the August 1, 2008 Exchange Agreement involved the sale by Sempra to Trafigura of Mars crude oil, also 1,000 barrels per day (approximately 30,000 barrels per month) for the period September 1, 2008 through and including September 30, 2008. The price of the crude oil was set at $122.15 per barrel, and delivery was to be made by line transfer out of LOOP Pipe Line Company's facilities at Clovelly, Louisiana.

      8.     The second exchange agreement (the "August 12, 2008 Exchange Agreement") was entered into between Sempra and Trafigura on or about August 12, 2008. The terms of the August 12, 2008 Exchange Agreement were identical to the terms of the August 1, 2008 Exchange Agreement with the exception of price.

      9.     Part 1 of the August 12, 2008 Exchange Agreement involved the purchase by Sempra of 1,000 barrels per day (approximately 30,000 barrels per month) of Domestic Sweet crude oil from Trafigura, during the term September 1, 2008 through and including September 30, 2008, to be delivered via line transfer into Teppco Pipe Line Company's facilities at Cushing, Oklahoma. The price agreed upon was $114.30 per barrel.

      10.     The second part of the August 12, 2008 Exchange Agreement involved the sale by Sempra to Trafigura of 1,000 barrels per day (approximately 30,000 barrels per month) of Mars crude oil to Trafigura, for the period September 1, 2008 through and including September 30, 2008, to be delivered via line transfer out of LOOP Pipe Line Company's facilities at Clovelly, Louisiana. The price agreed on was $109.15 per barrel.

      11.     Apart from the prices, the terms of the August 1, 2008 Exchange Agreement and of the August 12, 2008 Exchange Agreement were identical. Paragraph 12 of

each agreement provides that if there is an imbalance of less than 1,000 barrels between the purchase and sale of crude oil delivered pursuant to Parts 1 and 2 of the agreements, then the deliveries would be deemed to be in balance. That same provision also provided that "any imbalance of 1,000 barrels or more will be settled by delivery of the total volume imbalance at the contract price in the month after the imbalance is agreed upon."

12.     Both the August 1, 2008 Exchange Agreement and the August 12, 2008 Exchange Agreement provide that they shall be governed by New York law (without reference to any conflict of law rules). Both agreements also provide that each party submits to the exclusive jurisdiction of the state and the federal courts situated in New York City, Borough of Manhattan.

13.     Both the August 1, 2008 Exchange Agreement and the August 12, 2008 Exchange Agreement include the following provision: "In addition, to the extent not inconsistent with this agreement, Conoco's General Provisions for domestic crude oil agreements dated January, 1993 shall apply with the following modifications: (a) in section c. Rules and regulations, delete the last sentence thereof; in section g. Financial responsibility, delete second and third paragraphs; (c) delete section h. Liquidation (see our non-performance clause above); (d) in section p. Assignment, delete from "unless such assignment" through the end of the sentence."

14.     The Conoco General Provisions for domestic crude oil agreements dated January 1, 1993 (the "Conoco GPs") is a standard set of terms and conditions widely used in the domestic crude oil trading industry as a basis for agreement between trading parties. The Conoco GPs include a number of provisions that are relevant to this dispute and to the contentions made by both parties.

15. Clause J of the Conoco GPs is titled "Exchange Balancing" and reads as follows:

> **J. Exchange Balancing**: If volumes are exchanged, each party shall be responsible for maintaining the exchange in balance on a month-to-month basis, as near as pipeline or other transportation conditions will permit. In all events upon termination of this Agreement and after all monetary obligations under this Agreement have been satisfied, any volume imbalance existing at the conclusion of this Agreement of less than 1,000 barrels will be declared in balance. Any volume imbalance of 1,000 barrels or more, limited to the total contract volume, will be settled by the underdelivering party making delivery of the total volume imbalance in accordance with the delivery provisions of this Agreement applicable to the underdelivering party, unless mutually agreed to the contrary. The request to schedule all volume imbalances must be confirmed in writing by one party or both parties. Volume imbalances confirmed by the 20th of the month shall be delivered during the calendar month after the volume imbalance is confirmed. Volume imbalances confirmed after the 20th of the month shall be delivered during the second calendar month after the volume imbalance is confirmed.

16. Clause E of the Conoco GPs is titled "Force Majeure" and reads as follows:

> E. Force Majeure: Except for payment due hereunder, either party hereto shall be relieved from liability for failure to perform hereunder for the duration and to the extent such failure is occasioned by war, riots, insurrections, fire, explosions, sabotage, strikes, and other labor or industrial disturbances, acts of God or the elements, governmental laws, regulations, or requests, acts in furtherance of the International Energy Program, disruption or breakdown of production or transportation facilities, delays of pipeline carrier in receiving and delivering crude oil tendered, or by any other cause, whether similar or not, reasonably beyond the control of such party. Any such failures to perform shall be remedied with all reasonable dispatch, but neither party shall be required to supply substitute quantities from other sources of supply. Failure to perform due to events of Force Majeure shall not extend the terms of this Agreement.
>
> Notwithstanding the above, and in the event that the Agreement is an associated purchase/sale, or exchange of crude oil, the parties shall have the rights and obligations described below in the circumstances described below:
>
> (1) If, because of Force Majeure, the party declaring Force Majeure (the "Declaring Party") is unable to deliver part or all of the quantity of crude oil which the Declaring Party is obligated to deliver under the Agreement or associated contract, the other party (the "Exchange Partner") shall have the right

5

but not the obligation to reduce its deliveries of crude oil under the same Agreement or associated contract by an amount not to exceed the number of barrels of crude oil that the Declaring Party fails to deliver.

(2) If, because of Force Majeure, the Declaring Party is unable to take delivery of part or all of the quantity of crude oil to be delivered by the Exchange Partner under the Agreement or associated contract, the Exchange Partner shall have the right but not the obligation to reduce its receipts of crude oil under the same Agreement or associated contract by an amount not to exceed the number of barrels of crude oil that the Declaring Party fails to take delivery of.

**Gulf Storms Cause Delivery Problems**

17. The Louisiana Offshore Oil Port (LOOP) is a deepwater port in the Gulf of Mexico. The port consists of three single-point mooring buoys used for the offloading of crude tankers and a marine terminal consisting of a two-level pumping platform and a three-level control platform. The onshore oil storage facility, twenty-five miles inland (the "Clovelly facility"), is connected to the port complex by a 48-inch diameter pipeline. It provides interim storage for crude oil before it is delivered via connecting pipelines to refineries on the Gulf Coast and in the Midwest.

18. The last week of August 2008, Hurricane Gustav formed in the Atlantic Ocean and moved to the Gulf of Mexico. It hit land in Louisiana on September 1, 2008 and caused substantial damage in Louisiana, including the area in and around Clovelly, Louisiana where the LOOP Pipe Line Company's facilities are located.

19. Hurricane Ike followed shortly after Hurricane Gustav. Hurricane Ike first made landfall in Texas, but affected large areas in Louisiana, including the area in and around the Louisiana Offshore Oil Port and the Clovelly facilities.

20. Neither Hurricane Gustav nor Hurricane Ike affected the delivery by Trafigura of Domestic Sweet crude out of the facilities at Cushing, Oklahoma (Part 1 of both the August 1, 2008 Exchange Agreement and the August 12, 2008 Exchange Agreement). Pursuant

to the parties' agreement, Sempra took delivery of the crude pursuant to Part 1 of both Exchange Agreements, and paid Trafigura for such deliveries at the contractually agreed-upon price.

21. The storms in the Gulf did, however, affect the ability of Sempra to deliver crude under the two Exchange Agreements. Because of the intensity of both Hurricane Gustav and Hurricane Ike, the offshore platforms from which crude is delivered by pipeline, were not producing any crude. The result was that Sempra, like other companies similarly situated, was not able to receive Mars crude at the Clovelly onshore facility, and consequently had insufficient quantities of Mars crude to deliver to contractual counterparties such as Trafigura. Initially, Sempra believed that the offshore platforms would go back online shortly after Ike left the area, but by virtue of the intensity of the storm, that did not happen for a substantial period of time.

22. Sempra did have a relatively small amount of Mars crude in storage. To the extent possible, Sempra attempted to meet its contractual obligations to provide Mars crude to its many counterparties, but by virtue of the shortfall caused by the Gulf storms, it was forced to cut back the amounts it delivered to its counterparties, including Trafigura. The two Exchange Agreements obligated Sempra to deliver a total of 60,000 barrels of Mars crude to Trafigura in September, but as a consequence of the shortfall, Sempra was only able to deliver an aggregate of approximately 6,000 barrels of Mars crude to Trafigura under the two Exchange Agreements.

23. As a result of the shortage in Mars crude caused by the Gulf storms, there was a substantial imbalance between the amount of crude purchased by Sempra's pursuant to Parts 1 of the two Exchange Agreements, and the amount of crude Sempra was able to sell to Trafigura pursuant to Parts 2 of each Exchange Agreement. During the month of September Trafigura had been able to deliver approximately 30,000 barrels of Domestic Sweet under Part 1

of both Exchange Agreements (that is, an aggregate of 60,000 barrels under the two Exchange Agreements). In contrast, Sempra had only been able to deliver a fraction of the agreed upon volume under Part 2 of the Exchange Agreements, resulting in a imbalance under each of the Exchange Agreements of 27,045 barrels of Mars crude (that is, an aggregate 54,090 barrels under the two Exchange Agreements) that the parties had agreed would be sold by Sempra to Trafigura during the month of September.

24. Pursuant to paragraph 12 of both the August 1, 2008 Exchange Agreement and the August 12, 2008 Exchange Agreement and to clause J of the Conoco GPs, because there was an imbalance of more than 1,000 barrels between the amounts of crude delivered pursuant to Parts 1 and 2 of the Exchange Agreements, that imbalance was to be settled by delivery of the total volume imbalance at the contract price in the month after the imbalance is agreed upon (or in the second month when the volume imbalance is confirmed after the 20th of the month). Accordingly, Sempra contacted Trafigura to reschedule delivery of all volume balances.

25. On September 10, 2008, Sempra sought to reschedule delivery of 19,000 barrels in November 2008; on September 19, 2008, Sempra sought to reschedule 29,000 barrels for delivery in November 2008; and on September 23, 2008, Sempra sought to reschedule delivery of an additional 6,090 barrels for delivery in November 2008.

26. Trafigura agreed to Sempra's request to reschedule delivery of 24,000 barrels of Mars crude at $122.15 per barrel (the agreed price in the August 1, 2008 Exchange Agreement), but refused to accept delivery of 30,090 barrels of MARS crude.

27. Trafigura contends that it is not required to accept delivery of the imbalance. Trafigura claims that it had no obligation to accept delivery, because Sempra had simply failed to deliver the contractual quantity, and did not declare force majeure pursuant to

the Conoco GPs. Trafigura contends that, accordingly, the contract had lapsed and that it had was no longer obligated to buy any portion of the Mars crude it did not want.

28.     Trafigura has taken the position that it has no obligation under either the Exchange Agreements or under Clause J of the Conoco GPs to accept delivery of the Mars barrels that Sempra was unable to deliver because of the Gulf storms. Trafigura contends that Clause J applies only to small discrepancies in barrels exchanged over the course of a contract. Trafigura also claims that the parties agreed on October 28, 2008 that Trafigura would not be obligated to take delivery on the additional barrels, although Sempra has repeatedly informed Trafigura that it did not make any such agreement, and that any communications that Trafigura allegedly understood to constitute such an agreement were made in error and/or wrongly interpreted by Trafigura.

29.     Contrary to Trafigura's purported interpretation of its agreements with Sempra, both paragraph 12 of the Exchange Agreements and clause J of the Conoco GPs by their terms apply to the facts of this dispute. There is nothing in either of the two provisions that indicates that they apply only to small discrepancies, other than the statement that if the imbalance is less than 1,000 barrels, then the deliveries shall be deemed to be in balance. By their express terms, both paragraph 12 of the Exchange Agreements and clause J of the Conoco GPs apply to the imbalances created under both Exchange Agreements. Further, clause J of the Conoco GPs has consistently been interpreted and applied in the crude oil trading industry over a long period of time to apply to associated purchases/sales, or exchanges of crude oil, and to require that if as a result of events such as those that occurred here, there is an imbalance of the exchange of volumes, that imbalance is to be settled by the delivery of the under-delivered amount in a subsequent month, at the contractually agreed upon price.

9

## AS AND FOR A FIRST CAUSE OF ACTION

30. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 29 above as if fully set forth herein.

31. Sempra has fully and completely performed its obligations under the August 1, 2008 and the August 12, 2008 Exchange Agreements to purchase Domestic Sweet crude oil from Trafigura, pursuant to the Part 1's of both agreements.

32. Because of the Gulf storms, and Sempra's inability to deliver the full 60,000 barrels of Mars crude during the month of September as provided for under the Part 2's of the Exchange Agreements, there was an imbalance of 54,090 barrels between the crude purchased by Sempra from Trafigura under the Part 1's of the two Exchange Agreements, and the crude sold by Sempra to Trafigura under the Part 2's of the two Exchange Agreements.

33. Pursuant to the terms of the two Exchange Agreements, the Conoco GPs and industry custom and practice, Sempra therefore attempted to reschedule delivery of the Mars crude for delivery during subsequent months.

34. Trafigura agreed to the rescheduled delivery of 24,000 barrels of Mars crude.

35. In breach of its contractual obligations, Trafigura has rejected Sempra's attempts to reschedule the delivery of 30,090 barrels of Mars crude.

36. After it became clear that Trafigura was going to refuse to honor its contractual commitment with Sempra, Sempra mitigated its losses, by selling the crude Trafigura had agreed to buy on the open market, at the then current market price of $55.715 per barrel, a price that was significantly below the contractually agreed prices set out in the two Exchange Agreements. Accordingly, as a direct and foreseeable consequence of Trafigura's rejection of

Sempra's attempts to deliver the MARS crude, Sempra has been damaged in the amount of $1,647,444.15, comprised of a loss of $202,294.58 with respect of the 3,045 barrels that were undelivered under the August 1, 2008 Exchange Agreement, and a loss of $1,445,149.58 with respect of the 27,045 barrels that were undelivered under the August 12, 2008 Exchange Agreement.

WHEREFORE, Plaintiff demands judgment against Defendant in an amount not less than $1,647,444.15, plus interest, costs and expenses, including reasonable attorneys' fees.

Dated: New York, New York
May 29, 2009

GOLENBOCK EISEMAN ASSOR BELL
& PESKOE LLP

By: _____
Jeffrey T. Golenbock
Pamela Zimmerman

437 Madison Avenue
New York, New York 10022
(212) 907-7300

*Attorneys for Plaintiff Sempra Energy Trading LLC.*